Estate of Alfred Johannes Schneider-Paas, Alfred C. Schneider-Paas, Executor v. Commissioner.
Estate of Schneider-Paas v. Commissioner
Docket No. 1797-62.
United States Tax Court
T.C. Memo 1969-21; 1969 Tax Ct. Memo LEXIS 274; 28 T.C.M. (CCH) 81; T.C.M. (RIA) 69021; January 30, 1969, Filed *274 A. Jesse Duke, Jr., and Herbert P. Polk, for the petitioner. John J. Hopkins, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in estate tax of petitioner in the amount of $4,428,496. All of the issues raised by the petition have been disposed of by the parties with the exception of the fair market value of 282 shares of stock in a German company held by Alfred Johannes Schneider-Paas at the date of his death, December 11, 1957. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is the Estate of Alfred Johannes Schneider-Paas, Alfred C. Schneider-Paas, executor. Alfred Johannes Schneider-Paas (herein after referred to as decedent) died on December 11, 1957. At the time of his death he was a citizen of the United States residing in Montclair, New Jersey. Alfred C. Schneider-Paas, the decedent's son, was appointed executor of decedent's estate. The address of the executor at the time the petition in this case was filed was Montclair, New Jersey. The executor filed the estate tax return for decedent's estate on June 11, 1959, with the district director *275 of internal revenue, Newark, New Jersey. During the 1920's the decedent, who was then a citizen and resident of Germany, purchased 362 Kuxe (shares) of Gewerkschaft Eisenhuette Westfalia (hereinafter referred to as G.E.W.). In 1946 he transferred 80 of such shares to 4 of his children. These shares continued to be owned by the 4 children from the time of such transfer until the date of their father's death. At the date of his death decedent owned the remaining 282 of the 362 shares he had acquired in the 1920's. G.E.W. is classified under German law as a Gewerkschaft. A Gewerkschaft is generally a mining company and such a company is not governed under German law by the same statutes as are other German corporations. Generally, a German corporation is an Aktiengesellschaft or a GmbH. A share in a Gewerkschaft is called a Kuxe. The number of Kuxe of a Gewerkschaft is 100. However, the number of Kuxe can be 1,000 or multiples thereof but not more than 10,000. The Kuxe cannot be divided or split as can the shares of other corporations. 82 G.E.W. was organized and began business in 1826. Its original purpose was the mining of moorstone and its smelting. At all times pertinent *276 herein, the right to mine has not been utilized by G.E.W. and over the years G.E.W. developed into a foundry. In 1930, it started to manufacture machinery. It is unusual for a Gewerkschaft to be a manufacturing corporation. When it was organized the ownership of G.E.W. was represented by 1,000 shares which by its charter it was authorized to issue. The shares of a Gewerkschaft are assessable. If a shareholder does not pay the amount of the assessment, he has the right to offer his shares to the Gewerkschaft. The Gewerkschaft will then sell the Kuxe at auction and out of the value received at the auction pay the Gewerkschaft the assessment and then return any excess to the stockholder. In 1932 G.E.W. assessed its shareholders. The holders of 284 shares of the 1,000 shares turned their shares over to G.E.W. as a result of the assessment, and G.E.W. has held the 284 shares since 1932. There have been no assessments placed on the shares of G.E.W. since 1932. At the time decedent became associated with G.E.W., he became chairman of the executive committee of the company, which position he retained until 1947 when he and his wife emigrated to the United States. In 1947 decedent became *277 disassociated with the active management of G.E.W. After becoming a United States citizen in 1953, decedent was re-elected to the executive committee of G.E.W. as vice chairman, which position he retained until the date of his death. The 282 shares of G.E.W. owned by decedent at the date of his death represented approximately 39 percent of the outstanding shares of G.E.W. The next largest block of shares was owned by a trust for a German family, which trust owned 182 shares. Of the remaining shares, 30 shares were owned by one individual, 20 shares by each of four of decedent's children and 20 shares by another individual, 17 shares by an individual, 14 shares by one individual, and 11 by another. There were 3 individuals who owned 8 shares each, one who owned 7 shares, five who owned 5 shares each, three who owned 3 shares each, two who owned 2 shares each and 11 who owned 1 share each. Except for the shares owned by decedent and the 80 shares owned by his four children who in the late 1940's became American citizens, and 12 shares part of which were owned by two Dutch people who were husband and wife all of the shares of G.E.W. were owned by German citizens. When decedent left *278 Germany and discontinued his active participation in the management of G.E.W., a German lawyer by the name of Keil, who was decedent's personal legal representative in Germany, became chairman of the executive committee of G.E.W. and remained in that capacity until 1958. Also during the time decedent was living in America his personal certified public accountant and financial consultant in Germany was the managing director or chief executive officer of G.E.W. The charter and bylaws of G.E.W. provide for an executive committee of at least three and not more than six members, which committee is to be elected by the shareholders. Provision for the manner of election is set forth in the charter and bylaws and contains the following: If in a final election of the chairman another member receives at least one-third of the votes cast, he shall take office as deputy chairman. Similarly, if in the election of the third member another member receives at least one-third of the votes cast, he shall take office as the fourth member of the committee. In the above cases no separate election shall be held for deputy chairman or for the fourth member. The charter provides for notices to be sent *279 of meetings of the executive committee, that normally at least one meeting of the executive committee shall be held each month, and that the executive committee shall act by majority vote following a general discussion. The executive committee shall have a quorum if three members are present including either the chairman or deputy chairman. The bylaws provide that a general meeting of shareholders shall be held annually during the first half of the year at the Westfalia plant and that a shareholders' meeting shall have a quorum if a majority of the shares are represented at it. If no such majority is represented, a second shareholders' meeting shall be held within a month and the second meeting shall have a quorum with respect to all subjects on the agenda, regardless of the number of shares represented, provided it has been stated in the notices as a second shareholders' meeting called because of lack of a quorum at the preceding meeting. The bylaws provided that the 83 shareholders' meeting adopt its decisions by a simple majority except with respect to certain specified matters or when amending the charter which required a three-fourths majority. The charter provided that *280 a single shareholder may demand the right to inspect the books of account only if he holds at least 300 shares but several members, joining together, owning at least 300 shares, shall be permitted to have their agent make an inspection of the books for the purpose of auditing. Alfred C. Schneider-Paas (hereinafter referred to as Alfred), decedent's son and the executor of his estate, was born in Germany in 1914. He went to England in 1933 as an exchange student and in November 1936 came to the United States and became a citizen of the United States during World War II. From 1936 to 1947 he worked for various companies in the United States and in January 1940 bought a small manufacturing company in Highland Mills, New York, which he operated during the war in defense production. In 1949 decedent founded Mining Progress, Inc., a New York corporation, the main business of which was to represent G.E. W.'s interest in North America. Mining Progress, Inc. began business in 1951 and in 1953 Alfred became its treasurer and he has remained in that capacity until this date. From 1953 through 1957 Alfred made two or three trips each year to Germany to assist his father at the annual shareholders *281 meeting of G.E.W. and in connection with business matters involving Mining Progress, Inc. and G.E.W. In August 1957 Alfred was elected to the executive committee of G.E.W. and at the reorganization of G.E.W. in January 1958 the executive committee was re-elected and Alfred became its chairman which position he continued to hold until the time of the trial of this case. Prior to the time Alfred was elected to the executive committee of G.E.W. in August 1957, there had been five members of the committee, and Alfred, when he was elected, made the sixth member. The members of the executive committee are elected for a term of 4 years and may be reelected. Alfred had attended during the 4 years preceding his election to the executive committee at least six meetings of that committee as an adviser to his father. The declaration of a dividend by a Gewerkschaft is controlled by the shareholders. Dividends are declared by a majority vote of the shareholders in favor of the dividends. In the case of a Gewerkschaft which does not own a mine, which was the situation with respect to G.E.W., a vote of 75 percent of the voting shares is required to liquidate the company. In 1931 G.E.W. began *282 the manufacture of underground coal mining machinery. In Germany the long wall mining method of underground coal mining is used as distinguished from the room and pillar method of mining generally used in the United States. G.E.W. manufactured machinery for long wall coal mining. At the time G.E.W. commenced the manufacture of underground coal mining machinery, an engineer named Loebbe started designing such machinery for G.E.W. Long wall mining consists basically of drilling a shaft of from 100 to 300 yards long into a coal vein forming a narrow, low tunnel. The coal is extracted by loosening it from the long side of the tunnel. Long wall mining machinery systems consist of three main components: A machine for conveying the coal from the shaft, a winning machine, and a roof support. The roof support is a mechanism to support the weight of the coal and the earth above the seam. As coal is loosened and removed from the shaft, mining proceeds forward into the seam of coal permitting the earth above the worked seam to collapse. Following the end of World War II in 1945 most manufacturing plants in Germany were either destroyed or not in workable condition and the economy was in a very *283 disrupted state. In 1948 with the currency reform put in by the Government of West Germany, recovery began in the German economy. From the practical standpoint the currency reform eliminated the old currency and only a small amount of the new currency, the Deutsch Mark (DM) was issued. From a practical standpoint all corporations and individuals had to start business operations anew in 1948. Due to American help, to some extent through the Marshall Plan, and many other factors, recovery of the West German economy proceeded at a fast pace following 1948. One of the major problems in Germany in 1948 and for some years following that date was a shortage of capital. By 1957 and for a number of years prior thereto, G.E. W.'s principal products were coal mining machinery although it continued to manufacture certain other machines. In 1957 non-coal mining machinery amounted to approximately 5 percent of G.E. W.'s total sales. Included in the manufacture of coal mining machinery are parts for such 84 machinery. Of G.E. W.'s total production of coal mining machinery and parts, approximately 60 percent was of machinery and 40 percent of parts. Prior to 1939 G.E.W. had been manufacturing *284 and selling a double-chain type conveyor and a winning machine which is a plow or planter. In the 1930's this type conveyor and winning machine had become the standard tool used by the mining industry in Germany and was beginning, prior to World War II, to be used in other parts of Europe. G.E. W.'s conveyor and winning machine were covered by patents filed under German law. Subsequent to World War II certain competitors of G.E.W. began making a conveyor which G.E.W. considered to be in violation of its patent on its conveyor. G.E.W. worked out a compromise with its competitors whereby it granted licenses to certain of its competitors under its conveyor patent. Demag is a publicly held German corporation engaged in the manufacture of large machinery for diversified uses. Included among the products Demag manufactures are machines for long wall mining which are competitive with the machines manufactured by G.E.W. In 1955 Demag began manufacturing a conveyor which G.E.W. considered to be in violation of its patent. Discussions between representatives of Demag and G.E.W. with respect to G.E. W.'s position in connection with the conveyor being manufactured by Demag led to representatives *285 of Demag stating to representatives of G.E.W. that Demag contemplated filing a proceedings to nullify G.E. W.'s conveyor patent. Negotiations between Demag and G.E.W. continued and were terminated by an agreement whereby G.E.W. purchased from Demag its 1959 production of conveyors and a supply of spare parts for 350,000 DM and Demag agreeing to refrain in the future from manufacturing the double-chain conveyor which G.E.W. contended violated its patent. The last patent covering any part of G.E. W.'s conveyor was issued in 1949. In Germany a patent is legally good for a period of 17 years. There were other manufacturers of conveyors for long wall mining in Germany in 1957. The winning machine which was developed by G.E.W. during the 1940's reached a fully developed state in the latter part of 1950. Many parts of G.E. W.'s winning machine were patented under German law and some parts of this machine were patented in countries other than Germany. During the 1940's G.E. W.'s coal plow which was a part of its winning machine was experimentally tried out in a Germanowned mine. The mine operators filed seven patents with respect to this coal plow which they later sold to the Coal Industry *286 Association. Difficulties developed between the Coal Industry Association and G.E.W. in connection with G.E. W.'s further development of its coal plow. Negotiations between G.E.W. and the Coal Industry Association with respect to the further development of G.E. W.'s coal plow which began in 1953 were settled in early 1958 by G.E. W.'s agreeing to take from the Coal Industry Association a royalty-free license for all coal plows delivered in Germany and to pay a 6 percent royalty on all plows shipped abroad. In addition G.E.W. agreed to pay 150,000 DM to the Coal Industry Association and to license German competitors to use G.E. W.'s plow patents on a royalty-free basis. G.E. W.'s sales market was primarily the European coal mining industry. It did export some machinery to the United States, England, Belgium, Holland, and France. The offices and manufacturing facilities of G.E.W. are located in Wethmar, near Lunen, Westfalia, Germany, which is a part of the Ruhr Basin. G.E.W. had an English subsidiary which it acquired in 1956 called Underground Mining Machinery Ltd. (hereinafter referred to as UMM) in which it owned a 66 2/3 percent interest. It also had an affiliate called Unterage *287 GmbH (hereinafter referred to as UGmbH) in that part of the Saar Region which, until 1959, was under the control of France. During 1957 and years prior thereto at least from 1953, G.E.W. owned a 42 1/2 percent interest in UGmbH. In addition to exports to England and France through its affiliated companies, G.E.W. also exported machinery during 1957 and for a number of years prior thereto to Belgium and Holland. In England there were no plows manufactured which were similar to those manufactured by G.E.W. other than those manufactured by G.E. W.'s English affiliate and all of this type of plow used in England were plows which had been purchased from G.E.W. or its English affiliate, UMM. In 1955 there were 43 coal plow installations in England and 18 of those 85 were of G.E.W. plows. The others were a type of cutting machine or drum cutter which winned coal from a long wall face by loosening it rather than shearing the coal as does the G.E.W. plow, and it was this English type plow which competed with G.E. W.'s plow. In Germany in 1955 there were 80 or perhaps a few more than 80, coal plow installations and of the total coal plow installations in Germany, 76 were G.E. W. *288 's installations. Both UMM and UGmbH were licensed by G.E.W. to manufacture plows and conveyors under G.E. W.'s patents. In addition to the conveyor and plow, in order to complete an underground mining installation for long wall mining, a roof support is necessary. When long wall mining commenced, the roof supports were of a type that had to be moved by hand. Sometime prior to 1957 an English company had designed and commenced manufacturing a self-advancing type of roof support. In 1957 and for a number of years prior thereto when G.E.W. would obtain a contract for a complete long wall underground mining unit, it would purchase from another company the best available type of roof support in order that it might make the full installation since in 1957 and prior thereto G.E.W. had not completed development of its own self-advancing roof support. In 1950 G.E. W.'s engineers had started the design of a high pressure hydraulic self-advancing roof support which in the view of officials of G.E.W. would revolutionize the coal mining industry by abolishing the need for men to manually move any part of the roof supports. By 1955 G.E.W. had a prototype of its hydraulic self-advancing roof *289 support. At approximately the time that G.E.W. began to experiment with the high pressure hydraulic self-advancing roof support, it began trying out its experimental models in the Frederick Heinrich Mine which is one of the best known mines in the Ruhr District of Germany. By the beginning of the year 1957 G.E.W. had installed 14 units in its experimental installation in the Frederick Heinrich Mine. On the basis of these installations in 1957 G.E.W. received in 1957 an order for 55 additional units for installation in the Frederick Heinrich Mine. Approximately 110 units of the hydraulic self-advancing roof supports are necessary for a mining face 150 yards long and 135 units are necessary for a face 200 yards long. In the early part of 1958 when G.E.W. was preparing its brochure for the Essen Fair which was to be held in September 1958, the officials preparing the brochure put in the brochure references to development of the hydraulic self-advancing roof support being at a state which would enable G.E.W. to solicit orders for the roof support. Prior to going to the Essen Fair officials of G.E.W. asked officials of the Frederick Heinrich Mine for endorsements of its roof support *290 since it had been experimenting in that mine for approximately 8 years. The chief of the operation of the Frederick Heinrich Mine flatly refused to give such endorsement and told the representatives of G.E.W. that the roof support was not ready to be offered to the mining industry as a whole because the safety of the miners depended on it and that further experiments were needed. G.E.W. continued the experimental installations at the Frederick Heinrich Mine and the units installed in 1957, 1958, and 1959 were brought back to G.E. W.'s factory, redesigned, rebuilt, and repaired several times before the hydraulic self-advancing roof support was considered ready to be marketed to mines in general. The first general sales by G.E.W. of the hydraulic automatic roof support were made in 1960. G.E. W.'s hydraulic automatic self-advancing roof support was of a more advanced design than the English type self-advancing roof support which had been sold in 1957 and for sometime prior thereto. G.E. W.'s hydraulic automatic roof support operates on a pressure of 4,200 pounds per square inch as compared with the English unit which operates at 1,400 pounds pressure per square inch. G.E. W.'s hydraulic *291 automatic roof support consists of two frames or legs, having on each side two props or jacks that move alternately, and while one side remains tight against the roof, the other side pulls itself along forward. When the side which is moved is set in place, the other side is automatically released and pulled forward. One of the difficulties encountered by G.E.W. in the development of its hydraulic self-advancing roof support resulted from its starting its experimenting with oil and being required by the German authorities to convert to an emulsion which caused corrosive problems and problems with operating valves and with the excess pressure valves. The problem of the selection of materials for 86 G.E. W.'s hydraulic self-advancing roof support was partially caused by the high driving pressures used in this support. In 1957 the engineers at G.E.W. concluded that it was necessary to redesign the valves and operating units of the hydraulic system to meet the high pressure and also to make certain changes in the power unit moving the roof support with respect to which certain trouble had been experienced. It was also necessary for G.E.W. to train its labor force to work with the *292 fine tolerances required in connection with the G.E. W.'s hydraulic roof support, and also necessary for G.E.W. to obtain the specialized equipment to deal with such fine tolerances. The first successful installation of G.E.W. hydraulic self-advancing roof support was in the United States where there was no prohibition against driving the support with oil. In 1957 the cost of a complete installation of a conveyor in a typical long wall mining operation would range from 100,000 DM to 200,000 DM and the cost of a complete installation of a plow in 1957 would range between 200,000 DM and 400,000 DM. In 1960 when G.E.W. commenced commercial sales of its hydraulic self-advancing roof support, the cost of a 150 unit support was approximately 630,000 DM. In 1960 the price range for a typical complete installation of all three components would range between a minimum of 900,000 DM and 1,500,000 DM, not including the power plant which was not marketed by G.E.W. Since 1953, G.E.W. has exhibited its mining machinery at the annual meetings of the Mining Congress shows in the United States which are usually held in May. In 1957 at the Cleveland show G.E.W. did not effect any sales of its machinery *293 in the United States. In the 1920's the American coal mining industry ceased the use of the long wall mining system. Around 1950 coal miners in the United States began again to show some interest in long wall mining systems with the expectation that such systems might yield greater production and labor savings. In 1951 G.E.W. made its first installation of long wall mining machinery in the United States. At that time the mining industry was considering machinery which would yield a 25-ton production per man per shift. In 1955, at the Mining Congress show in Pittsburgh, manufacturers of mining machinery were approached by American miners looking for machines capable of producing 100 tons per man per shift. The installation made by G.E.W. in 1951 was in mines operated by Eastern Gas & Fuel Associates which installation resulted from decedent's suggestion in 1948 to the Bureau of Mines that the long wall mining system should again be tried in the United States and the high interest evidenced in this type of mining by officials of the Bureau of Mines. The installation in the Eastern Gas and Fuel Associates mine was successful. However, since for so many years the room and pillar system *294 of mining had been used in the United States, G.E.W. was able to sell only a few installations in the United States during the years 1951 through 1957. However, the installation in the Eastern Gas and Fuel Associates mine was used by G.E.W. for advertising purposes. Representatives of G.E.W. would contact mine operators from various other countries who had for some reason come to the United States and take them to examine the long wall mechanized mining system which G.E.W. had installed at Eastern Gas and Fuel Associates and as a result of these inspection trips was able to make sales in the markets in various other countries. It was not until approximately 1964 that mining operators in the United States evidenced a real interest in long wall mining machinery. The model long wall mining installation which G.E.W. had in the Eastern Gas and Fuel Associates mine was the only comparable type of complete installation in the United States prior to the 1960's. This installation was in active use from the time it was installed in 1951 to the end of 1957. Its operation was closed at the end of 1957 and it did not again commence operation until August 1960. The mechanical roof supports which *295 were used in this installation had been purchased by G.E.W. from other companies. Prior to January 1, 1958, when the installation at Eastern Gas and Fuel Associates closed down other installations in the United States in which mining machinery manufactured by G.E.W. was in use had closed. In 1957 G.E. W.'s physical plant was composed of a foundry, three machine shops, a warehouse, an electro station, transformer station, service installations, 87 and a gear works. Two of the machine shops were general shops and one a welding shop. All of the plants, except the foundry and one general machine shop, were relatively new, having been built after the conclusion of World War II. The foundry and one of the machine shops had been constructed a number of years prior to the commencement of World War II. Most of the machinery used in G.E.W.'s plant had been acquired after World War II although there was some machinery in operation which was 20 or 30 years old. In 1957 G.E.W. had plans to modernize its foundry and had prepared a preliminary plan looking toward such modernization. In 1957 G.E.W. had an office building for the planning department which had been constructed after World *296 War II and was in the process of building a 3-story office building for the general business department. A separate building for executive officers had been rebuilt during 1957. During the years 1950 through 1957 G.E.W.'s exports, exclusive of sales of its affiliates, accounted for approximately 30 percent of its total sales. In 1957 German mining machinery manufacturers were the second largest exporters of such machinery in the world. G.E.W.'s principal market in Germany for its machinery is for use in the bituminous and anthracite mines. Its sales of machinery for use in lignite mines are relatively insignificant. The following schedule shows total production of bituminous coal in the West German Republic for the years 1950 through 1965 and the production per work day:
Production per
work-day
(In 1,000
(In 1,000
Year
tons)
tons)
(1950 = 100)
1950
125,739
414.3
100.0
1951
135,054
446.1
107.7
1952
139,356
4 60.3
111.1
1953
140,740
464.8
112.2
1954
144,721
477.8
115.3
1955
147,934
488.4
117.9
1956
151,363
499.9
12 0.7
1957
149,446
496.9
119.9
1958
148,838
494.8
119.4
1959
141,687
469.5
113.3
1960
142,287
468.4
113.1
1961 142,741
474.5
114.5
1962
141,136
467.6
112.9
1963
142,116
472.4
114.0
1964
142,201
469.6
113.3
1965
135,077
445.9
107.6
*297 The following table shows the total consumption of bituminous coal and briquettes in the West German Republic for the years 1952 through 1965: Total
Consumption
Year
(In 1,000 tons)
1952
88,127
1953
85,591
1954
88,830
1955
93,575
1956
97,860
1957
96,151
1958
88,241
1959
84,751
1960
92,905
1961
91,162
1962
94,041
1963
94,766
1964
89,535
1965
83,719
The following schedule shows the primary energy consumption in the West German Republic for the years 1955 through 1965 divided between at-home-produced energy and imported energy, energy sources, and total energy consumption: Energy source
1955
1956
1957
1958
1959
1960
Bituminous coal
At-home-produced
64.19
61.62
59.47
57.28
57.84
56.06
Imported
6.66
7.97
9.32
7.23
3.84
3.53
70.85
69.59
68.79
64.51
61.68
59.59
Lignite coal
At-home-produced
13.63
13.47
13.72
13.60
13.41
12.57
Imported
1.99
1.69
1.76
2.16
1.81
1.82
15.62
15.16
15.48
15.76
15.22
14.39
Mineral oil
At-home-produced
1.68
1.75
1.94
2.27
2.58
2.52
Imported
7.83
9.53
9.98
13.10
16.39
19.17
9.51
11.28
11.92
15.37
18.97
21.69
Natural gases
At-home-produced
0.20
0.27
0.28
0.29
0.34
0.36
Imported
0.20
0.27
0.28
0.29
0.34
0.36
Mine gas (manuf'd)
At-home-produced
0.04
0.04
0.02
0.04
0.04
0.03
Imported
0.00
0.00
0.00
0.04
0.04
0.02
0.04
0.04
0.03
Water power and
imported
KW (surplus)
At-home-produced
2.41
2.43
2.31
2.54
2.07
2.24
Imported
0.26
0.19
0.12
0.44
0.53
0.77
2.67
2.62
2.43
2.98
2.60
3.01
Nuclear energy Imported
Other At-home-produced
1.11
1.04
1.08
1.05
1.15
0.93
0.68
Total energy
consumption
At-home-produced
83.26
80.62
78.82
77.07
77.43
74.71
Imported
16.74
19.38
21.18
22.93
22.57
25.29
100.00
100.00
100.00
100.00
100.00
100.00
*298 Energy source
1961
1962
1963
1964
1965
Bituminous coal
At-home-produced
52.76
49.12
46.12
42.87
38.82
Imported
3.38
3.93
3.98
3.54
3.53
56.14
53.05
50.10
46.41
42.35
Lignite coal
At-home-produced
12.40
12.06
11.85
11.85
10.63
Imported
1.76
1.73
1.74
1.49
1.21
14.16
13.79
13.59
13.34
11.84
Mineral oil
At-home-produced
2.82
2.86
2.87
2.90
2.84
Imported
22.65
26.49
29.78
33.73
38.24
25.47
29.35
32.65
36.63
41.08
Natural gases
At-home-produced
0.41
0.48
0.62
0.90
1.21
Imported
0.00
0.00
0.01
0.41
0.48
0.62
0.90
1.22
Mine gas (manuf'd)
At-home-produced
0.03
0.04
0.04
0.05
0.06
Imported
0.00
0.00
0.01
0.03
0.04
0.04
0.05
0.07
Water power and
imported
KW (surplus)
At-home-produced
2.18
1.94
1.78
1.70
2.11
Imported
0.78
0.52
0.39
0.15
0.63
2.96
2.46
2.17
1.85
2.74
Nuclear energy Imported
0.00
0.02
0.01
0.02
0.02
Other At-home-produced
0.83
0.81
0.82
0.80
0.680
0.68
Total energy
consumption
At-home-produced
71.43
67.31
64.10
61.07
56.35
Imported
28.57
32.69
35.90
38.93
43.65
100.00
100.00
100.00
100.00
100.00
*299 The following table shows total orders received in the West German Republic for mining machinery in the years 1955 through 1961, broken down into categories with values in million DM: Category
1955
1956
1957
1958
1959
1960
1961
Underground installations
151.4
185.8
223.9
167.2
149.7
215.8
240.7
Pneumatic tools for mining and
17.2
20.6
20.1
16.0
14.6
18.1
14.7
quarrying industry
Shaft hoisting equipment
43.2
43.9
53.8
52.8
41.3
50.9
47.9
Coal preparation and coking
97.3
129.1
175.7
124.3
118.6
221.0
150.9
machinery
Spares and accessories for the
175.4
204.4
228.2
197.9
239.6
325.7
338.7
above positions
Conveyors and mining machines
68.8
80.8
109.1
60.7
109.5
110.7
138.6
for open-cast mines [1]
Oil and deep hole drills [1]
48.8
71.5
75.0
66.4
82.6
85.1
53.9
Total
602.1
736.1
885.8
685.3
755.9
1,027.3
985.4
In 1956 at the American Mining Congress show there were discussions of expansion plans in the coal mining industry. At the 1957 American Mining Congress show, no such plans were discussed. In each year from 1953 through 1956 G.E.W. had effected some sales of its machinery at the annual coal mining shows in the United States but none was effected in 1957. The following schedule shows total stocks of hard coal at mine in Belgium, France, Saar, West Germany, Netherlands, and the United Kingdom in thousands of tons as of the end of the years 1954 through 1957: West
Nether-
United
Year
Belgium
France
Saar
Germany
lands
Kingdom
1954
2,8 15
7,836
536
654
287
1,130
1955
371
5,983
229
572
292
2,330
1956
179
4,524
102
700
314
2,996
1957
1,412
4,582
181
735
376
8,807
Stocks of bituminous and anthracite coal in consumers' hands in West Germany were approximately 7 million tons at the end of 1956, 11 million tons at the end of 1957 and approximately 12 million tons at the end of 1958 and 9 million tons at the end of 1959. In a report dated April 8, 1958, prepared by the American Consul General's office in Duesseldorf, Germany and addressed to the Department of State, Washington, D.C., the following statement appeared: I. Summary. The most noteworthy development in the West German coal industry was the reversion to a buyers' market by years 89 end. The situation was complicated by record imports of U.S. coal and increased competition from fuel oil. A decrease in the overall growth rate of the West German economy added its pressure with a slight decrease in overall consumption. Domestic production of hard coal, for the first time since the end of World War II, declined by 0.9 percent to a 1957 total of 133,156,000 tons. Additional paid holidays and absenteeism resulting from the severe influenza epidemic in the fall were responsible. Coke production increased by 4 percent in 1957 to a new high of 45,193,000 tons, although the rate of increase was less than that of earlier years. Raw brown coal production increased by 1.7 percent to a record 96,811,000 tons, but brown coal briquette production declined slightly to 16,826,000 tons. Total imports rose by 12.1 percent to a total of 23,051,000 tons, including a record total of 15,974,000 tons of U.S. coal. Exports decreased slightly to 25,293,000 tons. Overall consumption of hard coal and its products declined slightly but total deliveries reached 120,084,000 tons. Of deliveries, year end consumer stockpiles included 11,092,000 tons of hard coal, 566,000 tons of coke at gas works, and 373,000 tons of hard coal at steel mill cookeries. Imports covered 21.5 percent of total hard coal deliveries, more than offsetting the reduced supply of domestically produced coal. * * * The outlook for 1958 is not too encouraging, with abnormally large stocks at pitheads and in the hands of consumers. Import restrictions, voluntary or forced, are viewed with increasing favor by the industry. It is realized however that Ruhr coal production is not now sufficient for the needs of West German industry and that imports will continue to be necessary. Competition from fuel oil is increasing and nuclear energy looms on the horizon as a competitor. Reduced industrial activity in the Federal Republic will aggravate the current over-supply of coal. II. Market Developments. The sellers' market for coal in the Federal Republic, which came into being in late 1954 and continued throughout 1955 and 1956 began to shift during the last quarter of 1957 in a movement that with great rapidity changed the entire market situation. The effect of this present buyers' market was not really felt in 1957 but became increasingly evident during the first quarter of 1958. The spectacular growth rate of West German industrial production in prior years created a demand for fuel that outstripped the capacity of West German coal mines, and in addition, was not being adequately met by the Ruhr coal allocation system. Consequently increasing reliance was placed on imported coal, mainly from the U.S. by industrial consumers, i. e., power plants, gas works, the iron and steel industry, etc. This tendency was accelerated by the drop in ocean freight rates which occurred shortly after the Suez crisis in late 1956 had pushed these freight rates to artificially high levels that could not be maintained. During the first and second quarters of 1957 importers eagerly entered into long term contracts (up to three years) for the importation of U.S. coal, at freight rates of between 40-60 shillings, to such an extent that total imports of U.S. coal during 1957 reached the unprecedented figure of approximately 16,000,000 tons. As a result, by the end of 1957 and during the early months of 1958, the total fuel consumption of many power stations and gas works in Northern Germany included as much as 90-95 percent U.S. coal. The relatively mild 1957/58 winter and existing consumer stocks slowed household purchases of coal so that pit head stocks began to accumulate in December 1957 and continued to accumulate at an increasing rate during the first quarter of 1958. The situation was complicated by a general slowing in late 1957 and early 1958 of the prodigious growth rate of the West German economy, with a consequent effect on fuel demand. Coal consumption declined slightly (1.1 percent decline), but miners' productivity increased, particularly in late 1957 and early 1958, after the influenza epidemic in the fall of 1957 had reduced output. Daily production of coal rose as demand slackened, until industrial consumer stocks of coking coal and coke also began to accumulate in late February and March 1958. Competition from fuel oil which, during 1957, satisfied an increasing percentage of fuel consumption further aggravated the unfavorable coal market situation, with every prospect of increased future reliance on fuel oil in view of the current heavy investment in oil processing plants and pipelines. The consequences of the changed market situation will not become fully apparent for some time with the most significant period probably the summer of 1958 (See Outlook). * * * 90 Face Work. The influence of face mechanization on productivity appears to be decreasing. Further noticeable advance of face mechanization depends largely on better roof support methods in difficult workings. Full mechanization of mining and loading of very hard types of coal, especially in thin seams, is still an unsolved problem, although tests of plane-like machines and devices without their own drives look promising. The use of hydraulic roof support posts and frames reduces support installation time and might permit coal plowing or cutting in faces so far not suitable for these processes. * * * X Outlook. Although the coal industry during most of 1957 was relatively tranquil, the basis was laid for difficulties that became apparent in the early months of 1958. Greatly increased importation of coal from abroad, chiefly from the U.S., the increase in the price of Ruhr coal, and increased competition from fuel oil, coupled with increased productivity on the part of the coal miners, and another relatively mild winter, led to an over supply of Ruhr coal for the first time since 1954. The outlook for 1958, if not bleak, is sobering. The coal surpluses, which have resulted from the combination of circumstances which took place during 1957, threaten to become menacing during late 1958. At first limited to household grade coal and coke, stockpiles by early April 1958 included excessive pit head supplies as well as near maximum industrial stocks of coal and coke. Reduced industrial activity, particularly in iron and steel, is now expected to result in abnormally low coal purchases during the second and third quarters of 1958, the season of the year when industrial and consumer stockpiles are normally replenished. A continuing high rate of importation of coal from the U.S. will continue, since the coal was purchased on long term contracts, although the total imports are expected to decline to less than 11,000,000 tons. Curiously enough, roughly 60 percent of the imported coal was contracted for by importers controlled by Ruhr coal interests, so that the recent outcry by the industry that coal imports be restricted has a hollow ring. Nevertheless, it is the opinion of many observers that political considerations in view of the forthcoming Northrhine-Westphalian general election in 1958, may compel Federal Government action to limit coal imports, although limitation of the validity of contracts to one year or 1 1/2 years appears to offer the only real possibility for government action. Industry sources feel that coal price increases during 1958 are extremely unlikely, but are also of the opinion that price decreases will not stimulate sales, despite the current competitive positions of imported coal and fuel oil. Long-term purchase contracts for Ruhr coal are hailed in some industry quarters as a solution, but deprecated by responsible industry spokesmen and importers who point out that most large industrial consumers have already entered into long-term contracts for U.S. coal. Subsequently, long-term purchase agreements for Ruhr coal could only become effective some time in the future. Those long-term contracts, now the subject of much discussion, were theoretically possible in the past, but fear of ECSC intervention through declaration of an emergency was feared if the former system of allocations was abandoned. No formal request for approval by ECSC is required and if deemed necessary, the industry will enter into such agreements, without fear of ECSC intervention, in view of the current market situation. Any increase in exports is rendered improbable by the Government's decision that exports must be sold at the domestic price. Ruhr coal can not thereby compete with U.S. coal even in such a favorable market as Argentina which has cut U.S. imports and would presumably welcome Ruhr coal if it was competitive. A solution to the present Ruhr situation may result from a combination of voluntary import restrictions, (entered into jointly by U.S. exporters and West German exporters); continued stockpiling (before WW II pit head stocks of as much as 5,000,000 tons were considered normal), and, if necessary, reduced production (although the latter measure is highly unpopular with both industry and labor). The long term outlook for continued imports of U. S. coal is good, since it is generally admitted that available Ruhr coal supplies are simply insufficient for the needs of the West German economy. The following schedule shows the debtor and creditor interest rates in West Germany since the currency reform: 91 Percent per annum
Central
Charges
Central
bank rate
for
Charges
Applicable
bank
for
money loans
for own
from
discount
advances
Under
rate
on
credit
Overdrafts
securities
agreement
1948 July 1
5
6
n1 /
n1 /
Sep. 1
5
6
9
10-1/2
Dec. 15
5
6
9-1/2
11
1949 May 27
4-1/2
5-1/2
9
10-1/2
July 14
4
5
8-1/2
10
1950 Oct. 27
6
7
10-1/2
12
1952 May 29
5
6
9-1/2
11
Aug. 21
4-1/2
5-1/2
9
10-1/2
1953 Jan. 8
4
5
8-1/2
10
June 11
3-1/2
4-1/2
8
9-1/2
1954 May 20
3
4
8
9-1/2
July 1
3
4
7-3/4
9-1/4
1955 Aug. 4
3-1/2
4-1/2
8
9-1/2
1956 Mar. 8
4-1/2
5-1/2
9
10-1/2
May 19
5-1/2
6-1/2
10
11-1/2
Sep. 6
5
6
9-1/2
11
1957 Jan. 11
4-1/2
5-1/2
9
10-1/2
Sep. 19
4
5
8-1/2
10
1958 Jan. 17
3-1/2
4-1/2
8
9-1/2
June 27
3
4
7-3/4
9-1/4
July 21
3
4
7-1/2
9
1959 Jan. 10
2-3/4
3-3/4
7-1/4
8-3/4
Sep. 4
3
4
7-1/2
9
Oct. 23
4
5
8-1/2
10
1960 June 3
5
6
9-1/2
11
Nov. 11
4
5
8-1/2
10
1961 Jan. 20
3-1/2
4-1/2
8
9-1/2
May 5
3
4
7-1/2
9
Percent per annum
Charges for discount credits
Items
amounting
to:
Applicable
DM 5,000
DM 1,000
from
acceptances
DM 20,000
to less
to less
Less than
purchased
or
than
than
DM 1,000
above
DM 20,000
DM 5,000
1948 July 1
[1] /
[1] /
[1] /
[1] /
[1] /
Sep. 1
8
6-1/2
7
7-1/2
8
Dec. 15
8-1/2-9-1/2
7
7-1/2
8
8-1/2
1949 May 27
8-9
6-1/2
7
7-1/2
8
July 14
7-1/2-8-1/2
6
6-1/2
7
7-1/2 [3] /
[2] /
1950 Oct. 27
9-1/2
8
8-1/2
9
9
1952 May 29
8-1/2
7
7-1/2
8
8
Aug. 21
8
6-1/2
7
7-1/2
7-1/2
1953 Jan. 8
7-1/2
6
6-1/2
7
7
June 11
7
5-1/2
6
6-1/2
6-1/2
1954 May 20
6-1/2
5
5-1/2
6
6
July 1
6-1/2
5
5-1/2
6
6
1955 Aug. 4
7
5-1/2
6
6-1/2
6-1/2
1956 Mar. 8
8
6-1/2
7
7-1/2
7-1/2
May 19
9
7-1/2
8
8-1/2
8-1/2
Sep. 6
8-1/2
7
7-1/2
8
8
1957 Jan. 11
8
6-1/2
7
7-1/2
7-1/2
Sep. 19
7-1/2
6
6-1/2
7
7
1958 Jan. 17
7
5-1/2
6
6-1/2
6-1/2
June 27
6-1/2
5
5-1/2
6
6
July 21
6-1/2
5
5-1/2
6
6
1959 Jan. 10
6-1/4
4-3/4
5-1/4
5-3/4
5-3/4
Sep. 4
6-1/2
5
5-1/2
6
6
Oct. 23
7-1/2
6
6-1/2
7
7
1960 June 3
8-1/2
7
7-1/2
8
8
Nov. 11
7-1/2
6
6-1/2
7
7
1961 Jan. 20
7
5-1/2
6
6-1/2
6-1/2
May 5
6-1/2
5
5-1/2
6
6
*300 92 Percent per annum
Central
Charges
Central
bank rate
for
Charges
Applicable
bank
for
money loans
for own
from
discount
advances
Under
rate
on
credit
Overdrafts
securities
agreement
1965 Jan. 22
3-1/2
4-1/2
8
9-1/2
1965 Mar. 1 [4]/
3-1/2
4-1/2
8
9-1/2
Percent per annum
Charges for discount credits
Items
amounting
to:
Applicable
DM 5,000
DM 1,000
from
acceptances
DM 20,000
to less
to less
Less than
purchased
or
than
than
DM 1,000
above
DM 20,000
DM 5,000
1965 Jan. 22
7
5-1/2
6
6-1/2
6-1/2
bills eligible
other bills
for
rediscount at
the
1965 Mar. 1 [4]/
7
Bundesbank1/2
1966 May 27 5 6-1/4 9-1/2 11 *301 8-1/2 *2*8 *2*9-
Aug. 13 4 5 8-1/2 10 7-1/2 *2*7 *2*8-1/2 *2*6-1/2 *2*8 The following schedule shows the gross sales of fixed-interest securities
and shares of domestic issuers of stock in West Germany from the second half
of 1948 through 1965: Millions of
DM, nominal value
Fixed-interest
securities
of which
Bank bonds
Mortgage
Bonds
Period
bonds
Communal
of
Other
(including
(and
specialized
bank
ship mort-
similar
credit
bonds
gage bonds)
bonds)
institutions
1948
2nd half
6.3
2.3
1949
201.1
33.0
19.9
1950
210.7
99.2
96.2
1951
468.0
158.9
1.9
1952
628.1
161.3
219.8
1953
1,043.4
42 9.4
224.6
1954
2,238.8
1,001.4
264.9
2.8
1955
1,381.7
1,026.1
507.7
1956
1, 038.2
616.1
14.2
1957
1,161.1
1,125.2
265.2
1958
1,618.8
2,337.6
521.1
2.0
1959
3,050.0
2,363.7
1,331.1
1960
2,343.4
1,119.9
501.1
3.0
1961
3,641.5 2,505.3
1,051.2
100.0
1962
4,096.2
2,368.2
1,12 2.0
401.1
1963
4,070.8
3,397.6
1,857.9
969.2
1964
4,805.9
3,772.1
1,775.1
1,441.9
1965
4,331.2
3,691.1
1,242.7
1,392.7
1964 Oct.
377.4
284.3
32.7
143.5
Nov.
364.2
165.5
23.7
73.2
Dec.
544.0
283.5
223.2
155.2
1965 Jan.
582.6
441.6
129.4
205.0
Feb.
444 .0
382.1
250.7
270.2
March
488.4
287.6
98.0
65.9
April
372.5
343.2
78.2
134.2
May
238.6
200.8
63.1
129.6
*302 The following schedule shows the gross sales of fixed-interest securities
and shares of domestic issuers of stock in West Germany from the second half
of 1948 through 1965: Millions of
DM, nominal value
Gross
Total
sales
Industrial
Period
bonds
Loans of
Total
(including
public
Total
convertible
authorities
bonds)
1948
2nd half
8.6
10.0
18.6
1949
254.0
95.7
420.4
770.1
1950
406.1
53.3
217.1
676.5
1951
628.8
61.7
56. 9
747.4
1952
1,009.2
130.3
418.2
1,557.7
1953
1,697.4
396.3
808.2
2,901.9
1954
3,507.9
791.6
391.5 4,691.0
1955
2,915.5
432.0
333.2
3,680.7
1956
1,668.5
563.7
332.0
2,564.2
1957
2,551.5
931.1 700.9
4,183.5
1958
4,479.5
1,651.9
1,903.7
8,035.1
1959
6,744.8
919.5
2,039.2
9,703.5
1960
3,967.4
27.5
1,332.6
5,327.5
1961
7,298.0
319.6
1,991.2
9,608.8
1962
7,987.5
1,076.1
2,780.9
11,844.5
1963
10,295.5
1,552.5
4,576.5
16,424.5
1964
11,79 5.0
973.7
4,138.7
16,907.4
1965
10,657.7
585.8
3,589.2
14,832.7
1964 Oct.
837.9
50.0
458.7
1,346.6
Nov.
626.6
370.0
996.6
Dec.
1,205.9
6.0
35.3
1,247.2
1965 Jan.
1,358.6
150.0
797.5
2,306.1
Feb.
1,347.0
11.3
1,358.3
March
939.9
115.8
119.5
1,175.2
April
928.1
452.3
1,380.4
May
632.1
375.0
1,077.1
*303 The following schedule shows the gross sales of fixed-interest securities
and shares of domestic issuers of stock in West Germany from the second half
of 1948 through 1965: Millions of
DM, nominal value
among
Fixed-
of
Period
which:
interest
loans
Medium-
Shares
securities
of
term
and
foreign
notes
shares
issuers
1948
2nd half
0.5
19.1
1949
41. 3
811.4
1950
51.2
727.7
1951
164.7
912.1
1952
259.3
1,817.0
1953
268.7
3,170.6
1954
453.0
5,144.0
1955
1,554.8
5,235.5
1956
1,837.5
4,401.7
1957
1,631.7
5,815.2
21.0
1958
102.0 1,139.5
9,174.6
92.0
1959
1,295.2
1,383.0
11,086.5 344.6
1960
568.5
1,904.5
7,232.0
44.8
1961
388.7
2,192.4
11,801.2
12.0
1962
810.0
1,506.7
13,351.2
100.0
1963
1,528.7
1,015.7
17,440.2
160.0
1964
1,981.0
1,608.4
18,515.8
895.0
1965
1,453.8
2,645.9
17,478.6
1,389.2
1964 Oct.
102.8
126.5
1,473.1
60.0
Nov.
80.2
90.2
1,086.8
Dec.
104.0
71.1
1,318.3
1965 Jan.
245.8
86.4
2,392.5
65.0
Feb.
164.5
288.7
1,647.0
157.3
March
184.9
78.0
1,253.2
400.0
April
17.5
90.9
1,471.3
May
197.4
327.6
1,334.7
106.7
*304 94 Millions of DM,
nominal value
Fixed-interest
securities
of which
Mortgage
Bonds
Period
bonds
Communal
of
Other
(including
(and
specialized
bank
ship mort-
similar
credit
bonds
1965
gage bonds)
bonds)
institutions
June
276.8
376.5
13.8
138.1
July
404.3
513.4
305.9
88.0
Aug.
235.0
256.7
41.9
74.8
Sept.
297.1
245.2
64.4
54.0
Oct.
346.5
154.8
23.2
71.4
Nov.
295.5
248.7
97.8
89.2
Dec.
349.9
240.5
76.3
72.3
Millions of DM,
nominal value
Gross
Total
sales
Industrial
Period
bonds
Loans of
Total
(including
public
Total
convertible
authorities
1965
bonds)
June
805.2
270 .0
343.6
1,418.8
July
1,311.6
482.5
1,794.1
Aug.
608.4
60.6
669.0
Sept.
660.7
57.9
718.6
Oct.
595.9
326.3
922.2
Nov.
731.2
50.0
347.2
1,128.4
Dec.
739.0
215.5
954.5
Millions of DM,
nominal value
among
Fixed-
of
Period
which:
interest
loans
Medium-
Shares
securities
of
term
and
foreign
1965
notes
shares
June
74.1
415.3
1,834.1
26.6
July
55.8
176.5
1,970.6
116.8
Aug.
89.0
544.9
1,213.9
Sept.
63.4
105.5
824.1
Oct.
86.6
221.3
1,143.5
236.8
Nov.
162.0
70.1
1,198.5
160.0
Dec.
112.8
240.7
1,195.2
120.0
*305 The following schedule shows sales, gross income, total income, expenditures and profit of G. E. W. for each of the years 1953 through 1960 and separately shows the depreciation deducted which is included in total expenditures shown: [1]
1953
1954
1955
1956
(In DM)
(In DM)
(In DM)
(In DM)
Sales
76,106,690.00
58,526,399.00
73,009,460.00
96,517,068.00
Gross income
40,996.056.69
28,154,605.06
38,943,915.38
49,641,616.04
Total income
41,591,351.10
28,789,313.33
39,381,132.48
50,897,476.19
Expenditures
31,144,328.64
23,638,414.56
27,385,227.37
34,809,126.55
Profit
10,447,022.46
5,150,898.77
11,995,905.11
16,088,349.64
Depreciation
1,827,234.48
2,087,509.81
2,252,541.91
2,584,092.55
deducted
The following schedule shows sales, gross income, total income, expenditures and profit of G. E. W. for each of the years 1953 through 1960 and separately shows the depreciation deducted which is included in total expenditures shown: [1]
1957
1958
1959
1960
(In DM)
(In DM)
(In DM)
(In DM)
Sales
124,197,450.00
105,695,295.00
81,163,276.00
102,150,035.00
Gross income
63,087,856.43
52,844,013.53
38,468,873.22
47,397,556.29
Total income
64,720,501.19
55,407,956.52
40,778,408.40
49, 996,525.44
Expenditures
44,342,295.68
40,192,699.24
33,31 0,961.82
39,158,694.11
Profit
20,378,205.51
15,215,257.28
7,467,446.58
10,836,831.33
Depreciation
3,269,996.77
3,818,002.37
3,345,024.59
3,143,417.57
deducted
*306 96 The following schedule shows the assets, liabilities, capital, and undivided profits of G.E.W. as of December 31 for each of the years 1952 through 1960: 1952
1953
1954
(In DM)
(In DM)
(In DM)
Assets
50,797,734.52
70,966,741.21
49,261,757.52
Current Liabilities
31,405,186.04
41,157,834.52
13,228,459.38
Capital
8,148,000.00
8,148,000.00
20,148,000.00
Undivided profits
1,103,235.04
9,770,184.23
3,939,899.37
Profit for year
9,417,213.44
10,447,022.46
5,150,898.17
1957
1958
1959
(In DM)
(In DM)
(In DM)
Assets
106,683,048.10
105,127,646.68
119,039,693.17
Current Liabilities
23,275,218.69
10,259,025.05
11,989,595.35
Capital
41,148,000.00
46,322,946.00
49,235,473.00
Undivided profits
10,535,237.90
24,307,457.41
35,984,698.69
Profit for year
20,378,205.51
15,215,257.28
7,467,446.58
1955
1956
(In DM)
(In DM)
Assets
65,285,122.91
84,602,097.75
Current Liabilities
17,184,419.66
20,764,796.85
Capital
21,148,000.00
34,148,000.00
Undivided profits
7,732,798.14
6,091,288.26
Profit for year
11,995,905.11
16,088,349.64
1960
(In DM)
Assets
129,494,711.93
Current Liabilities
17,462,077.73
Capital
59,277,396.00
Undivided profits
31,280,039.87
Profit for year
10,837,831.33
*307 The undivided profits for each of the years 1952 through 1957 were arrived at by adding to undivided profits at the close of the previous year the profits for the year and deducting therefrom dividends, certain tax adjustments, obsolescence write-offs, transfers to capital, and for one year a depreciation adjustment, in accordance with the following schedule: 1952
Undivided Profit 12/31/51
DM
1,103,235.04
Profit for Year
9,417,213.44
10,520,448.48
Deduct: Dividends
143,200.00
Tax Adjustment after
Exam.
607,064.25
750,264.25
1953
OUndivided Profit 12/31/52
9,770,184.23
Corporation Tax Refund
937,492.68
Profit for the Year
10,447,022.46
21,154,699.37
Deduct: Dividends
214,800.00
Obsolescence write-Off
5,000,000.00
Transfer to Capital
12,000,000.00
17,214,800.00
1954
Undivided Profit 12/31/53
3,939,899.37
Profit for the Year
5,150,898.77
9,090,798.14
Deduct: Dividend Paid
358,000.00
Transfer to Capital
1,000,000.00
1,358,000.00
1955
Undivided Profit 12/31/54
7,732,798.14
Profit for the Year
11,995,905.11
$019,728,703,25
Deduct: Dividend Paid
429,600.00
Add'1. Corp. Tax
207,814.99
Transfer to Capital
13,000,000.00
13,637,414.99
1956
Undivided Profit 12/31/55
6,091,288.26
Profit for the Year
16,088,349.64
22,179,637.90
Deduct: Dividend Paid
644,400.00
Obsolescence Write-Off
4,000,000.00
Transfer to Capital
7,000,000.00
11,644,400.00
1957
Undivided Profit 12/31/56
10,535,237.90
Profit for the Year
20,378,205.51
Depreciation Adjustment
3,998.00
30,917,441.41
Deduct: Dividend Paid
1,074,000.00
Transfer to Capital
5,000,000.00
6,074,000.00
Undivided Profit 12/31/57
DM
24,843,441.41
*308 The following schedule shows the assets, liabilities, and capital of UGmbH, G.E.W.'s French affiliate, in French francs as of December 31, 1957: Assets Current Assets
Cash on Hand
90 943
Cash in Banks
79 515 887
Accounts Receivable
403 750 119
Notes & Trade Acceptances
Receivable
625 000
Other Receivables
24 834 982
Total
508 816 931
Working & Trading Assets
Raw Materials & Supplies
179 194 171
Goods in Process
95 077 620
Finished Goods
27 075 435
Total
301 347 226
Total Current Assets
810 164 157
Fixed Assets
Investments
19 000 000
Land & Buildings
91 347 485
Machinery & Equipment
128 751 741
Total Fixed Assets
239 099 226
Prepayments
433 344
Total Assets
1049 696 727
Liabilities
Current Liabilities
Accounts Payable
93 657 158
Trade Acceptances Payable
17 280 000
Customers' Deposits
24 785 188
Owing to Affiliated Companies
125 782 318
Other Liabilities
73 879 556
Accrued Taxes of Expenses
66 448 272
Total Liabilities
401 832 492
Capital
Capital Stock Issued
20 000 000
Earned Surplus 1/1/57
482 493 753
Plus: Profit for the Year
145 379 482
627 864 235
647 864 235
Total Liabilities and Capital
1049 696 727
*309 For each of the calendar years 1953 through 1957, UGmbH, G.E.W.'s French affiliate, had total sales, gross manufacturing profit, income from operations and net income in French Francs as shown by the following schedule: Income
Gross
Income from
manufac-
Year
from sales
turing
operations
Net income
profit
1953
675,214,864
380,794,213
91,968,047
68,076,998
1954
1,388,975,3 80
442,475,482
85,874,448
60,546,956
1955
1,746,420,904
606,531,626
132,106,498
89,271,827
1956
1,935,551,392
632,332,653
87,203,503
57,215,986
1957
2,501,532,065
890,949,754
227,644,595
145,370,482
The following schedule shows the assets, liabilities and capital of UMM, G.E.W.'s English affiliate in English pounds as of March 31, 1958: Assets
Current Assets
Cash on Hand
110 5 0
Cash in Bank
35 221 5 6
Accounts
233 265 7 10
Receivable
Deposits and
Loans
Receivable
2 678 9 6
Total
271 275 7 10
Inventories
21 729 19 6
Total Current
293 005 7 4
Assets
Fixed Assets
Land & Buildings
13 703 12 5
Machinery &
51 468 9 11
Equipment
Total Fixed
65 172 2 4
Assets
Total Assets
358 177 9 8
Liabilities
Current
Liabilities
Accounts Payable
28 650 15 3
Owing to
Affiliated
Companies
140 741 14 0
Accrued Expenses
30 657 14 6
Taxes Payable
76 217 11 11
Total Current
276 267 15 8
Liabilities
Fixed Liabilities
- Loan
Payable
2 600 0 0
Total Liabilities
278 867 15 8
Capital
Capital Stock
Issues
GEW
20 000 0 0
Other
10 000 0 0
stockholders
30,000 Shares
30 000 0 0
Issues
Earned Surplus on
April
1, 1957
21 931 1 2
ADD: Profit for
the year
1957/1958
27 378 12 10
Total Earned
49 309 14 0
Surplus
79 309 14 0
Total Liabilities
358 177 9 8
& Capital
*310 The following schedule shows the gross sales, gross profit on sales, net operating profit, and net profit in English pounds of UMM for the fiscal years ended March 31, 1956, March 31, 1957, and March 31, 1958: Gross
Gross profit
Net operating
Year
sales
on sales
profit
Net profit
1956
42,905. 3.11
14,643.16. 8
8,439. 2. 3
2,437. 4. 9
1957
220,981.17. 5
90,894. 5. 2
61,228. 8. 0
1,493.16. 5
1958
587,371.18. 4
169,544.16. 0
106,990. 8.10
27,378.12.10
On December 11, 1957 the value of a German deutsche mark was 0.238 United States dollars or a ratio of approximately 4.2 deutsche marks per United States dollar. Prior to 1957 the rate of exchange between French francs and German deutsche marks was 100 francs to 1.2 deutsche marks. Thereafter the rate of exchange was 100 francs to 1 deutsche mark. For the years 1956 and 1957 the rate of exchange between English pounds and German deutsche marks was one English pound to 11.76 deutsche marks. There are no German companies whose stock is listed on the public exchange and with respect to which financial statements are published that are strictly comparable to G.E.W. A listed German corporation, *311 Demag, manufactures underground mining machinery in competition with G.E.W. but also manufactures many other varieties of heavy machinery, furnishes engineering and consulting services in installing such machinery and manufactures and sells other products. A listed corporation, Wedag, is engaged in building construction and home construction, as well as the manufacture of industrial machinery. Orenstein-Koppel, another West German corporation whose financial data was [sic] published and whose stock was listed is engaged in the manufacture of large conveyors and of coal and earth moving equipment, floating dredgers and cranes, construction machines, Diesel locomotives, passenger and freight railroad cars, track installations, narrow gauge and field railway equipment, buses, disc brakes, elevators and other conveyor installations, escalators, passenger conveyor belts, and traveling scaffolds, and a number of other activities. In Germany in 1957 and the preceding years, corporations who published their earnings data generally grossly understated their actual true earnings in their published reports. The fact that such understatement was made in the published reports was common knowledge *312 in Germany and in the United States among persons knowledgeable with respect to German investments. It was generally believed by these persons that the reason for the understatement was to conceal the company's true earnings from the shareholders because of the fact that the stockholders, at the annual meeting of stockholders, declared the annual dividend the company would pay, and management of the companies who were desirous of retaining earnings in the companies, felt that concealment of true earnings would result in a more conservative dividend being voted by the shareholders. In 1957 and immediately preceding years, it was the practice of certain private investment bankers in Germany to calculate the true earnings of a German corporation on the basis of considering the relationship between the taxes paid and the published earnings of the corporation. These calculations were made by the banks for the benefit of their customers and were used by their customers when considering the making of investments in the various companies. While a portion of the understatement of earnings might be reflected in excessive depreciation deductions, it was more prevalent for companies to conceal *313 true earnings by creating various reserves which would be merely designated on the balance sheet as "specific or other reserves" or by writing off such assets as inventories, accounts receivable, or fixed assets by merely reducing their value and crediting some reserve or merely creating a reserve on the liability side of the balance sheet as a method of diminishing earnings. The following schedule shows for each of the years 1953 through 1959 the published earnings, estimated true earnings calculated on the basis of taxes paid, depreciation deducted, dividends, and price as of December 31, 1957, all on a per share basis stated in 1,000 deutsche marks for Demag, Wedag, and Orenstein-Koppel: 101 Estimated
Price
Published
true
Depreciation
per share
earnings
earnings
deduction
Dividend
Dec. 1957
Demag
1953
8.7
16.8
13.9
9
1954
9.5
16.0
10.0
9
1955
11.9
17.0
8.7
10
1956
11.1
20.0
12.8
10
1 957
14.5
22.8
17.3
10
190
1958
18.6
30.2
16.9
12
1959
21.3
30.5
15.6
12
Wedag
1953
0.6
1.3
0.7
9
1954
0.7
2.0
2.4
9
1955
0.8
3.5
2.3
10
1956
0.9
2.7
2.2
10
1957
1.2
2.9
2.3
10
232
1958
1.6
3.4
1.9
12
19 59
1.9
2.4
1.9
12
Orenstein-Koppel
1953
0.8
1.3
3.6
7
1954
0.8
1.8
5.2
8
1955
1.4
2.0
7.9
9
1956
1.4
1.4
7.8
9
1957
1.5
1.6
7.5
9
160
1958
2.0
3.1
7.7
12
1959
2.1
3.8
7.9
13
*314 Chash flow is computed by adding depreciation deducted to earnings. The following schedule shows the dividends paid by G.E.W. in each of the years 1949 through 1960: Dividend per Kux
Year
paid in DMs
1949
50
1950
50
1951
100
1952
100
1953
200
1954
300
1955
500
1956
600
1957
900
1958
1,500
1959
1,500
1960
3,000
In Germany dividends declared in a year are out of the previous year's earnings, that is, the 1950 dividend would be out of 1949 earnings. Prior to the annual meeting of the shareholders of G.E.W. there would be a meeting of the executive committee. At this meeting of the executive committee, as at the other executive committee meetings, matters on the agenda were generally discussed and with respect to some items there would be extended debate. However, during all of the years of existence of G.E.W., the ultimate vote at the meetings of the executive committee was always unanimous, except for one instance in 1941 when the representative of the German family trust on the executive committee objected to G.E.W.'s offering bonus shares to the inventor, Loebbe, and to the then executive director. At the meeting of the executive *315 committee just prior to the annual meeting of shareholders, the executive committee would determine a dividend to be recommended to the shareholders at the annual meeting. The annual shareholders meeting was presided over by the chairman of the executive committee and he would recommend the agreed-to dividend. Generally there were questions raised with respect to the amount of the dividend and at times minority shareholders would question whether the dividend might be increased. On one occasion prior to his death, decedent questioned whether the dividend recommended by the chairman of the executive committee might not be raised. However, throughout the entire history of G.E.W. the dividends as actually declared were declared by the unanimous decision of the stockholders at the meeting to accept the recommendation of the executive committee. Alfred attended the annual meeting of the shareholders in the years 1954 through 1957 as an advisor to decedent. Approximately 90 percent of the shareholders of G.E.W. would be present in person at these meetings. Generally, the shareholders who did not attend the annual meeting would give proxies to other shareholders but not necessarily to the *316 management of G.E.W. It was not the practice of G.E.W. to solicit proxies from the shareholders for purposes of the annual meetings nor was there generally any solicitation of proxies by anyone for the purpose of the annual meeting. 102 During the years 1953 through 1957, in addition to the chairman who was decedent's personal lawyer, decedent who was vice chairman, and the accountant who was both decedent's personal accountant and the accountant for G.E.W., as well as executive director of G.E.W., there was a fourth member of the executive committee, Oscar Schultz who owned 30 shares of G.E.W. and who had been a member of the executive committee since 1930. Under German law there is an assessment in the nature of a tax made by the Government on corporate shares. The assessment notice sets forth the "gemeinwert" which is the determination of the value of the shares of a closely held corporation on the basis of which the tax will be imposed. The notice issued to G.E.W. determining the gemeinwert as of December 31, 1956, for its shares placed a value of 25,000 DM per share on those shares which were not held as part of a block of shares and a value of 42,000 DM on those shares *317 held in blocks. The assessment notice issued to G.E.W. contained a statement that gemeinwert had been determined on the basis of sales of shares during the years 1956 and 1957 and the assets and prospects of the corporation. There were no sales of shares of G.E.W. stock during the years 1956 and 1957. Although the shares of G.E.W. stock have never been traded on any stock exchange, during the period 1949 through 1961 there were a few sales and transfers of shares of G.E.W. stock. The following schedule shows all such sales or transfers during the years 1949 through 1961, other than the transfer of decedent's shares to his estate: [See Table on Page 103] Most of these sales and transfers were by parties related in some way to one another. The two sales on November 22, 1958 by Otto Wossidlo of shares to each Alfred and Hans Greef were not transfers between related individuals. However, at the time Otto Wossidlo was in need of funds in building. nection with the construction of a new building. The three transfers made by Georg Kortmann on December 15, 1961 of one share to each Adalbert Keil and Hans Greef and of two shares to Alfred were not transfers between related parties. *318 Georg Kortmann was in need of money at the time of these transfers to satisfy large bank loans he had outstanding. The purchasers in all instances of shares which were not transfers between related parties were persons serving as an officer or director of G.E.W. at the time of the purchase. There are specific provisions of German statute stating the manner in which tax officials are to fix the gemeinwert for shares in closely held corporations or kuxe in Gewerkschafts. The sections of German law dealing with the determination of the gemeinwert state that the valuation is to be based on the fair market value unless something else is prescribed and that fair market value is to be determined by the price which could be realized in a sale under ordinary business circumstances considering the condition of assets and specifically provide as follows: For corporate shares, mining shares, shares in a limited liability company and participating debentures which are not officially quoted within Germany, the fair market value * * * is controlling. If it is impossible to derive the fair market value from sales, it has to be estimated considering the net worth and the prospective earnings of *319 the corporation or mining company. In practice there existed a regulation of the taxing authorities which provided a formula which might be used in determining the gemeinwert of shares of stock in corporations or mining companies which were not listed. This formula was in general use in Germany during the 1950's although it was not mandatory on the tax department to use the formula. In Germany the gemeinwert assigned to shares of stock in a closely held corporation is generally one of the factors considered between parties in attempting to negotiate a price at which stock will be purchased and sold. A general description of property offered for sale in Germany, referred to as an "expose," sets forth items which the seller considers significant for trading in a particular item. Where an expose is made with respect to shares of stock in a closely held corporation, it is the usual practice in Germany to include with the other information set forth therein the latest gemeinwert attributable to the shares. When two individuals who are forming a German corporation are considering entering into a buy-sell agreement with respect to the stock, it is not uncommon that the gemeinwert be used *320 instead of the book value per share for the purposes of such buy-sell agreement as generally the gemeinwert of a German company is higher than the balance sheet value per share because the gemeinwert in many 103 No. of
shares
Price paid
Date
Seller
Buyer
sold
in DM
3/16/49
Berta Schulz, Dortmund
J.C.O. Schulz, Alsdorf
1
1,200.00
3/14/50
von Schorlemer, Munster
Adalbert Keil,
1
1,200.00
Karlsrube
5/9/50
E. H. Walter and M.S.M.
Oscar Schulz, Bad
1
1,200.00
Clausen
Godesberg
11/8/50
Wilhelm Eckey, Luenen
J.O.C. Schulz, Alsdorf
5
5,000.00
1951
Heirs of Meister
Oscar Schulz, Bad
3
3,600.00
Godesberg
12/17/52
Heirs of Carl Duncker,
Wolfgang Sakken
1
1,500.00
Luenen
6/29/54
Adele Weidtmann
Victor Weidtmann's
2
4,800.00
Family Trust, Osterode
8/16/54
Paul Weimar, Quint
Banking House Burgardt
1
4,000.00
and Brockelschen
9/4/54
B. H. Burgardt &
Schuchtermann-
1
4,000.00
Brockelschen
SchillerscheFamily
Trust
4/25/58
Heirs of M. Schmale,
Heinz Schmale,
1
4,000.00
Dusseldorf
Dusseldorf
6/2/58
Heirs of Victor Wolff,
Paul Schmale,
1
Dusseldorf
Dusseldorf
6/3/58
Heirs of Victor Wolff,
Mathilde Schmitz,
1
Dusseldorf
Dusseldorf-Wersten
7/23/58
Heirs of Victor Wolff,
Heinz Schmale,
1
Dusseldorf
Dusseldorf
11/22/58
Heirs of Einhaus,
Wilhelm Zoyen, Rhoydt
1
Dusseldorf
11/22/58
Otto Wossidlo, Hamm
Alfred C. Schneider
2
40,000.00
Paas Cappenberg
11/22/58
Otto Wossidlo, Hamm
Hans Greef,
1
20,000.00
Altluenen-Wethmar
5/29/59
Maria Kortmann,
Gerhard Kortmann Co.,
5
137,500.00
Cappenberg
Cappenberg
11/22/59
Wilhelm Zoyen, Rhoydt
Paul Schmale,
1
Dusseldorf
12/15/61
Georg Kortmann,
Adalbert Keil,
1
33,000.00
Cappenberg
Karlsruhe
12/15/61
Georg Kortmann,
Hans Greef,
1
33,000.00
Cappenberg
Altluenen-Wethmar
12/15/61
Georg Kortmann,
Alfred C. Scheider
2
66,000.00
Cappenberg
Pass, Cappenberg
*321 instances reflects reserves and intangible assets as well as goodwill which items would not be reflected on the corporate balance sheets. In the immediate post-war years the governments of West Germany and of certain municipalities in West Germany were issuing government securities in an effort to obtain funds for a government. In this early period industrial companies that were able to float public bond issues did so at an interest rate of 8 percent and then generally the bonds were sold at a discount, in effect increasing the interest rate to the issuers. During this time public companies were raising capital by selling shares to their shareholders at prices substantially below the quoted values on the stock exchange. These shares were underwritten by banks which would purchase the shares not subscribed by the individual shareholders. There were 1.8 billion shares of German securities issued in 1956, 1.6 billion shares issued in 1957, and 1.1 billion shares issued in 1958. From 1948 through 1965 there was a period of economic recovery in Germany. Although industrial production in Germany constantly increased during this period, commencing in 1956 the increase was at a lesser *322 rate than prior thereto. From 1953 to 1954 industrial production in Germany increased by approximately 18 percent; from 1954 to 1955 the increase was 20 percent; from 1955 to 1956 the rate of increase was approximately 10 percent; from 1956 to 1957 the increase was approximately 5 percent; and from 1957 to 1958 again the increase was approximately 5 percent. In the United States during the period July 1957 through April 1958 there was a drop in industrial production. Gross national product grew in Germany 5.8 percent in 1957 as compared to a 12 percent growth rate in 1955 and a 7 percent growth rate in 1956. The cost of living index in Germany increased 2 percent and industrial prices increased 1.7 percent in 1957. Overall employment rose 4.2 percent in 1957 but in that year the normal working hours of over 6 million people employed in industry were reduced from 48 hours to 45 hours per week with the result that there was little change in the total man hours worked between the years 1956 and 1957. Wages and salaries in Germany rose 8.1 percent in 1957 over 1956 and during this same period productivity of labor increased approximately 4 percent. All during the 1950's there was a labor *323 shortage in western Germany. This labor shortage was referred to in various publications with respect to coal mining with the recommendation that further mechanization of mines was a possible solution to such labor shortage. Under German corporation law a corporation owing a 25 percent or more interest in another corporation is not taxed on dividends received from such other corporation if the dividends are passed on to the shareholders of the parent. The rate of tax on the parent corporation in the year 1957 on dividends received from another corporation in which it owned 25 percent or more interest which were not passed on to its shareholders, was 15 percent as compared with the normal tax rate of 40 percent on operating income. Blocks of shares consisting of 25 percent of the total shares of a corporation are frequently traded in Germany and it is not uncommon for banks to purchase such blocks of shares. During the years 1957 through 1963 there were purchases of German securities by American investors. As of 1957 Vicker's Guide to Investment Company Portfolios listed two American funds having portfolios which included German securities. He number of German securities held by American *324 funds and the number of American funds holding such securities had substantially increased by 1960 and 1961. As of 1957 there were 182 different American investments in European countries totaling 119 million dollars, wherein the investment constituted a minority interest of the specific business. Of these, 70 such investments having a value of 69 million dollars had been made prior to 1946, 30 such investments with a value of 22 million dollars were made during the years 1946 to 1950, and 82 such investments with a total value of 28 million dollars were made during the years 1951 to 1957. As of 1954 there were issued in Germany shares of stock representing an approximate value of 453 million DM and during each of the years 1955 through 1965 there were shares issued having a total value of at least 1,000 million DM. From approximately the middle of 1956 through the middle of 1957 the German stock market was in a general state of decline. From the beginning to the end of 1957 the German stock market index rose 5 percent. During this same year the United States stock market declined 12.8 percent. In December 1957 the German stock market 105 index was at a level of 37.6 as *325 compared to its lowest level in 1957 which was a level of 34.43 in June 1957. Joy Manufacturing Company is an American listed corporation which during the 1950's was engaged to a large extent in the manufacture of mechanized underground coal mining machinery for use in the room and pillar type of mine. Another listed American company engaged in manufacturing mechanized underground coal mining machinery, among other products, was Goodman Manufacturing Company. The different economic situations and other factors affecting American corporations and German corporations are such that a valuation of a German corporation based on ratios of the price of the stock to earnings, book value, sales or net worth of an American corporation requires such substantial adjustments to arrive at any comparability as to render this approach unrealistic. American Depository Receipts (ADR's) were the means by which some German securities were traded in the United States in 1957 and for some years prior and subsequent thereto. ADR's are a method which enables an investor to make an investment in American dollars for the purchase of a foreign stock. In 1957 the Chemical Bank in New York had outstanding *326 ADR's for five German companies. The number of German companies for which this bank issued ADR's increased several fold in 1960 and 1961 as compared to 1957. There were no German securities listed on any American stock exchange in 1957. As of the beginning of 1957 G.E.W. had a backlog of unfilled orders of approximately 19 million DM and by the middle of 1957 it had a backlog of approximately 35 million DM which had been reduced as of December 31, 1957, to approximately 27.4 million DM. As of the end of 1957 the management of G.E.W. was of the opinion that G.E.W. needed to retain the large cash reserve which it had for the purpose of perfecting its new self-advancing roof support and expanding its world market by building new plants in countries other than the two in which it, at that time, had affiliated companies. As of the end of 1957 G.E.W.'s ratio of current assets to current liabilities was 3.6. The similar ratio of Demag was 1.6, of Orenstein-Koppel 1.2 and of Wedag 1.3. Although G.E.W. had some difficulty prior to 1959 when the Saar region was returned to German control in obtaining dividends from its French affiliate, it did in 1957 obtain royalties from this affiliate. *327 Although G.E.W. had no difficulty obtaining dividends from its English affiliate, it did not actually receive any such dividends until 1958. The need for coal is directly related to the level of industrial production in a country. In the midfifties Australia, Japan, India, and Asia were building energy plants which would consume coal and were desirous of increasing their own coal production rather than importing the necessary coal. With an increase in coal production in these countries there would exist an available market for mechanized coal mining machinery to be exported to such countries. On the estate tax return filed for the Estate of Alfred Johannes Schneider-Paas, decedent's shares in G.E.W. were valued at $4,761.90 per share. Respondent in his notice of deficiency determined that the fair market value as of December 11, 1957, the date of death of decedent, of decedent's shares of G.E.W. stock was $38,500 per share. At the trial and on brief in the instant case, petitioner takes the position that the fair market value as of December 11, 1957, of decedent's 282 shares of G.E.W. stock was 57,000 DM or $13,566 per share and respondent on brief takes the position that the value *328 of decedent's 282 shares of G.E.W. stock as of the date of his death was 140,000 DM or $33,333 per share. Ultimate Finding of Fact The value of decedent's 282 shares of G.E.W. stock as of December 11, 1957, the date of his death, was 100,000 DM or $23,809 per share. Opinion The issue in this case is factual but nevertheless difficult. In addition to the problems that must be considered in valuing the shares of a closely held American corporation, consideration in this case must be given to the fact that the shares to be valued are of a German company. Some of the factors to be considered are the value of the underlying assets of the corporation, the earnings, the dividends paid, whether the interest being valued is a minority interest, the nature of the management of the company, as well as other factors such as the prospects and the economic environment in which the business operates, and the industry it serves. Estate of Harry Stoll Leyman 40 106 T.C. 100, 119 (1963), remanded on another issue 383 U.S. 832, and cases there cited. The opinions of expert witnesses *329 are, of course, of assistance in making the determination. In this case each party offered the testimony of an expert witness who had for a number of years kept abreast of the German securities market and had advised clients of their businesses with respect to the purchase and sale of foreign securities including German securities. In addition, respondent offered the testimony of a securities analyst employed by the Internal Revenue Service who made a valuation based on a statistical comparison of earnings, cash flow, and book value of G.E.W. with that of certain listed German and American corporations and the testimony of a person knowledgeable with respect to economic conditions in the coal industry. Petitioner, in addition to the testimony of an expert witness knowledgeable in trading of German securities, offered testimony of the executor of the decedent's estate with respect to his knowledge of conditions affecting G.E.W. both with respect to the plans of that company, economic conditions in Germany and the conditions existing in the German coal industry as of the end of 1957 and beginning of 1958, as well as the testimony of an individual knowledgeable in the computation of actual *330 earnings of German corporations. The expert offered by petitioner who had experience in sales of German securities valued the stock of G.E.W. as of December 11, 1957, at 57,000 DM per share, and the expert of respondent who was knowledgeable with respect to the sale prices of foreign securities valued the stock of G.E.W. as of December 11, 1957, at 140,000 DM per share. Petitioner now argues that the Court, in determining the issue in this case, should accept the value placed on the shares of G.E.W. stock by petitioner's expert in the foreign securities market; and respondent now argues that the Court should accept the value placed on the shares of G.E.W. stock by his witness knowledgeable in the sale of foreign securities. These two experts approached their valuation problem by using substantially the same underlying data, some of which we have set forth in some detail in our findings of fact. They had some differences of opinion with respect to the proper weight to be given various items and minor differences as to the amount of some items. Their major differences of opinion were with respect to the economic outlook as of December 11, 1957, of the German coal industry, the weight *331 to be given to this economic outlook, and to the effect on a price per share which would exist because of the number of shares being valued being approximately a 39 percent interest in the corporation. The two experts also differed substantially in their view as to the availability of funds for the substantial investment necessary to acquire 282 shares of stock of G.E.W. The two experts had some difference of opinion as to what consideration should be given to the investment of G.E.W. in its French and English affiliates in determining the fair market value of 282 shares of stock of G.E.W. They also disagreed as to whether only the earnings and profits for the year 1957 should be used in considering the evaluation of the shares of G.E.W. stock and if not what period of prior years should be considered. Petitioner's expert took the position that G.E.W. was a cyclical company with its high cyclical peak in 1957 and for this reason that at least a 5-year average earnings should be used in valuing its stock. Respondent's witness took the position that since the period 1953 through 1957 was a period of extreme growth in Germany, occasioned by the abnormal period of expansion caused by the *332 country's practically starting its economy over again after World War II, a 5-year average of earnings beginning with 1953 gives too great a weight to the period of the lower point in the recovery pattern. Both parties recognize that fair market value is that amount which a willing buyer would pay a willing seller, both being knowledgeable with respect to the items being bought and sold and under no compulsion to buy or sell. Petitioner recognizes this definition of fair market value and does not contend that the few actual sales which were made are determinative of the fair market value of the 282 shares which are being valued. However, the parties do argue as to the weight to be given to the small quantities of sales. Petitioner argues that weight should be given to the value determined for the gemeinwert but does not contend that such value in and of itself is determinative of the fair market value of the stock as of December 11, 1957. It is respondent's position that all the sales of G.E.W. stock were either between related persons or under conditions that in 107 substance amounted to forced sales and that these sales should be given no weight. Respondent argues that *333 the gemeinwert is merely someone else's opinion of a value based on some formula and therefore should be given no consideration in the determination of value. In this regard it is worthy of note that petitioner's expert testified that generally the gemeinwert would be in excess of the book value of the corporate shares of stock. In the instant case the gemeinwert as of the end of 1956 was determined at 25,000 DM for shares not in blocks and 42,000 DM for shares in blocks whereas under petitioner's computation the book value per share of G.E.W. stock at the end of 1957 was 118,800 DM and the unadjusted book value from the balance sheet was 116,421 DM per share. Respondent's computation of the book value as of the end of December 1957 is 126,662 DM per share. The difference between these two computations is primarily due to whether an item of 1,296,286 DM referred to on the balance sheet as reserve for export promotion should be subtracted from the book value as shown on the balance sheet to arrive at an adjusted book value. Both parties recognize that the value of the investment in the French and English affiliates should be added to the balance sheet value of G.E.W. in arriving at *334 an adjusted book value for the purpose of valuing G.E.W. stock. Both parties recognize that cash flow which they consider to be the earnings of the company after taxes plus depreciation is a better criteria for use as earnings of the company in determining the value of the shares of G.E.W. than is the earnings after taxes without any adjustment. The earnings and cash flow of G.E.W. as used by petitioner's expert witness in arriving at his valuation were as follows for the years indicated: Earnings
Cash flow
Year
per share
per share
(In DM)
(In DM)
1953
14,590
17,142
1954
7,194
10,110
1955
16,754
19,900
1956
22,469
26,078
1957
28,460
33,017
1958
21,250
26,582
1959
10,429
15,100
1960
15,137
19,527
Average
17,893
21,249
1953-1957
Average
15,605
20,403
1958-1960
Petitioner's expert witness made the following computations of value per share of G.E.W. stock: Book value per share (DM 85,088 million: 716)
= 118,800 DM
Yield value per share (Dividend of DM 1,500 capitalized at
= 30,000 DM
5 percent)
Earnings value per share (Five year average earnings of DM
= 53,700 DM
17,893 capitalized at 3 times)
Cash flow value per share (Five year average cash flow of
= 42,500 DM
21,249 DM capitalized at 2 times)
245,000 DM
Divided by 4
= 61,250 DM
*335 Based on these computations, his judgment as to the lack of easy marketability of a minority interest in G.E.W. stock, the gloomy outlook which he considered to exist at the end of 1957 for the German economy in general and for the coal mining industry and coal mining machinery industry in particular, and the difficulty of an investor's finding the amount of money necessary to purchase 282 shares of G.E.W. stock, as well as a number of factors which he considered of lesser importance, this expert arrived at what he considered to be a maximum fair market value of G.E.W. stock on December 11, 1957, of 57,000 DM per share. Respondent's expert witness, in arriving at his opinion, considered that 116 percent of adjusted book value, 4.7 times 1957 adjusted earnings, 6.0 times 1955-1957 average adjusted earnings, 7.4 times 1953-1957 average adjusted earnings, 4.1 times 1957 adjusted cash flow, 5.1 times 1955-1957 average adjusted cash flow, and 6.2 times 1953-1957 average adjusted cash flow were reasonable methods to be considered in determining a price at which 282 shares of G.E.W. stock would have sold per share on December 11, 1957. In making this determination he added in amounts *336 representing earnings of affiliates of G.E.W. to G.E.W's earnings and used earnings and cash flow in the following amounts: Year
Earnings per
Cash flow per
share (In DM)
share (In DM)
1953
16,282
18,933
1954
8,346
11,410
1955
17,594
20,975
1956
23,046
26,966
1957
29,606
34,473
1958
22,492
28,190
1959
11,674
16,607
1960
17,169
21,572
The earnings of the English affiliate were adjusted to a calendar year basis in making this computation. In coming to his conclusion respondent's expert considered the 39 percent interest which was represented by 282 shares to be in substance a controlling interest. He was of the opinion 108 that the upturn in the German stock market toward the end of 1957, the large amount of orders of machinery on hand at the end of 1957, the outlook for sales by G.E.W. in foreign markets, and the prospect of G.E.W.'s soon having available the mechanized self-advancing roof support of its own design, gave a much brighter outlook to the future prospects of G.E.W. than the outlook petitioner contended existed as of December 11, 1957. Although respondent's witness recognized that there was a decline in 1958 in the *337 coal industry in Germany, it was his opinion that the full import of this decline could not reasonably have been anticipated at December 11, 1957. We have considered the testimony of both these witnesses along with the other evidence of record. In our view, as of December 11, 1957, the outlook for G.E.W. in its German markets as well as its foreign markets was not as gloomy as painted by petitioner's expert, particularly in view of the fact that at that time G.E.W. was anticipating shortly having completed development of its own self-advancing roof support. However, we recognize that there existed indications of a forthcoming decline in coal production in Germany as of December 11, 1957, that would have been known to a prospective seller and purchaser of G.E.W. stock. However, there were in December 1957 indications that coal production might be increased in other countries. Also, decreasing of production costs by further mechanization is a factor considered by coal miners even when the coal mining industry is not at its highest peak. While we recognize, as petitioner contends, that the 39 percent interest which the 282 shares constitute could not control G.E.W., we likewise recognize *338 that the owner of this number of shares was assured at least the vice chairman's place on the executive committee and of a fourth member of that committee. By having a representative on the executive committee and being its vice chairman, information from the books of G.E.W. would appear to be available to an owner of 282 shares of stock even though the bylaws of G.E.W. provided that the right to inspect the books as a stockholder required a combination of 300 shares of the 1,000 shares of G.E.W. stock issued at the time G.E.W. was organized. Considering the factors that we have discussed, the opinions expressed by the various experts, the reasoning given in support of these opinions, and all the other evidence of record, we have concluded that as of December 11, 1957, the 282 shares of stock of G.E.W. owned by decedent at the time of his death had a value of 100,000 DM or $23,809 per share. Decision will be entered under Rule 50. Footnotes
1. Including spares and accessories. ↩
1. Up to February 28, 1965 compiled on the basis of announcements of the Hessian Bank Supervisory Authority; in most of the other Federal Lander equal rates applied. The rates apply only to credits fully taken. Turnover commission or charges per item processed are disregarded. ↩
3. From September 1, 1949, to October 26, 1950 = 7 percent.↩
2. From September 1, 1949 to October 26, 1950 = 7-1/2 percent.↩
4. From March 1, 1965 the rates laid down in the Interest Rates Order of the Federal Banking Supervisory Office apply; the charges for discount credits are no longer differentiated according to the amount of the bills.↩
1. "Cash flow" is computed by adding to profits the depreciation deducted.↩